IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | | |
|---|---|---|
| **In re:** | * | |
| | | |
| **W.F. DELAUTER & SON, INC.** | * | Case No.: 24-13955-MCR |
| **DELAUTER LEASING, LLC** | | Case No.: 24-13956-MCR |
| | * | |
| Debtors | | (Chapter 11) |
| | * | (Joint Administration Requested) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### OMNIBUS OBJECTION TO FIRST-DAY MOTIONS

L/B Water Service, Inc. ("L/B Water"), the estate's largest unsecured creditor, by Alan M. Grochal, Joseph M. Selba, Michael J. Lentz and Tydings & Rosenberg LLP, its undersigned counsel, files this Omnibus Objection to First-Day Motions, and in support thereof, states as follows:

1. On May 8, 2024, W.F. Delauter & Sons, Inc. and Delauter Leasing, LLC (collectively, the "Debtors") each filed a voluntary petition under Chapter 11 of the Bankruptcy Code (the "Petition Date"). Since then, they have been operating as Debtors-in-Possession.

2. As set forth in the List of 20 Largest Unsecured Claims filed with the W.F. DeLauter Petition, L/B Water is the estate's largest unsecured creditor with a debt of nearly $960,000 (dkt. 1, page 7).

3. Neither bankruptcy schedules nor a statement of financial affairs have been filed by either Debtor with the Petition, and therefore creditors have no basis for confirming either the

6157094.2

1


value of the Debtors' assets or the amount of debt.[1]

4. The Debtors ceased virtually all business operations at the end of March 2024.

5. One day after the Petition Date, the Debtor filed a number of emergency Motions and Applications as follows:  (1) Emergency Motion to Pay Pre-Petition Wages (dkt. 15); (2) Application to Employ Ritchie Bros. Auctioneers (dkt. 16); (3) Emergency Motion for Order Authorizing the Debtors to Obtain Post-Petition Financing (dkt. 17); (4) Motion to Sell Substantially All of the Debtors' Assets Free and Clear of Liens (dkt. 18); and (5) Emergency Motion to Use Cash Collateral (dkt. 19)(collectively, the "First Day Motions").

6. The First Day Motions are all inter-related.  They all relate to the Debtor's desire to sell all of its assets by public auction approximately one month after the Petition Date. It appears that the Debtor's assets consist entirely of construction equipment—not the type of assets that quickly depreciate in value if their disposition is delayed.

7. The relief sought by the Debtor should not be entertained on an emergency basis under any circumstances before schedules and statements have been filed.[2]  Even if schedules and statements had been filed, the request to sell all of the Debtor's assets in advance of a Plan would fail under the standards set forth in Judge Derby's decision in *In re Naron Wagner, Chartered,* 88 B.R. 85 (Bankr. D. Md. 1988).

## ARGUMENT

Normally, an Emergency Motion to Pay Pre-Petition Wages would be noncontroversial provided that no employee was being paid more than the statutory maximum for priority claims.

---

[1] This lack of information is exacerbated by the fact that while the Debtors acknowledge that there are more than a dozen UCC filings against their assets, they also claim that some of these are no longer active although termination statements may not have been filed.  Accordingly, even doing online research will not disclose the magnitude of secured debt.

[2] It is somewhat surprising that schedules and statements have not yet been filed in these cases given the fact that Debtors' counsel was retained roughly one month before the Petition Date as reflected in the Disclosure of Compensation (dkt. 3).

However, the Debtors laid off virtually all employees before the Petition Date. Nonetheless, the Wage Motion seeks to bring back furloughed employees, and pay them their accrued wages and benefits, so that they can assist with the public auction sale. This is not a case where a failure to pay pre-petition wages would result in a mass exodus by the Debtors' workforce. The Debtors have already caused a mass exodus, and admit to having only three employees on the Petition Date, Kirby DeLauter, William DeLauter and Jenny Burris.[3]

Moreover, the Ritchie Bros. Application reflects that it is Ritchie Bros. obligation to set up for the auction. There is no reason to bring back the Debtors' employees to provide post-petition services, at a cost of nearly $100,000 in prepetition priority wages and benefits, where such action will significantly diminish the funds that might be available for unsecured creditors. Accordingly, consideration of the Wage Motion should be deferred until this Court determines first whether the Debtors have provided a sufficient justification for a public auction sale at this early stage of the case, and secondly whether the Debtors are able to show why using Ritchie Bros. personnel is not a more economical alternative.

Similarly, retaining an auctioneer in a Chapter 11 case would be viewed as routine in many cases. However, here, as noted above, no schedules or statements have been filed and, more importantly, the Debtors have provided no evidence of any efforts to market the businesses for sale as a going concern before shifting to the less desirable option of conducting a fire sale of all of the assets. While L/B Water does not question the qualifications of Ritchie Bros. as a potential auctioneer, L/B Water respectfully asserts that it is premature as this early stage to immediately permit a public auction without evidence as to consideration of other options to maximize the value of assets, and without <u>any</u> financial information that would enable unsecured creditors to determine whether they will derive any benefit from the proposed auction or whether

---

[3] Kirby DeLauter is the 100% owner and President of the Debtors.

6157094.2

3

it is strictly a procedure to pay down secured debt and enrich Debtors' professional advisers without any benefit to unsecured creditors.

Complicating the retention of Ritchie Bros. is the Emergency Motion to Obtain Post-petition Financing.  The Debtors propose not only to employ Richie Bros. as their auctioneer, but also as their DIP lender.  Ritchie Bros.is prepared to lend the Debtor $250,000 on an interim basis and $500,000 on a final basis "to advance the goals of a robust and successful auction." Because L/B Water does not believe that an auction is appropriate at this early stage of the cases, the request for post-petition financing should be rejected.  While the proposed financing has some traditional earmarks, such as a junior secured position coupled with a super-priority administrative claim, the financing is heavily skewed toward protecting the Debtors' professionals, with carveouts for Debtors' counsel and Debtors' accountant, but no carveout for any Committee professionals. L/B Water believes that post-petition financing is not yet ripe for consideration because the Debtor has failed to justify the necessity of an immediate auction sale.

The most troublesome of all is the Motion to Sell Substantially All of the Debtor's Assets.  As discussed above, the Debtor is seeking authority to dispose of all of the Debtor's assets within the first month of the cases, before schedules and statements are filed, before a creditors meeting occurs, and before consideration as to whether a creditors committee should be appointed. While L/B Water does not necessarily suggest that a Committee is required in a liquidation case, someone needs to look out for the unsecured creditors and, as evidenced by the Motions being filed without the required level of disclosures being provided, the Debtors are simply trampling on the right of the unsecured creditors.

Moreover, the proposed auction involves  shuttered businesses with assets consisting entirely of construction equipment that will not decline in value if an auction sale is delayed for

several months.  As a preliminary matter, the sale motion does not provide a justification for this Court to consider an expedited timeline . The only "evidence" is general conclusory statements from the Debtors that an immediate sale is necessary to maximize the value of the assets. If the Debtors had been operating and needed a quick sale to preserve going concern value and goodwill, then exigent circumstances might be established.  However these are shuttered businesses with non-depreciating non-seasonal construction equipment.  Slowing down the process will enable creditors to develop a complete understanding of the benefits of a public auction and make an informed decision.  Furthermore, detailed financial information will provide an answer as to whether a public auction will generate funds for unsecured creditors or whether this process would be better accomplished outside of bankruptcy court by allowing secured creditors to simply foreclose on their collateral. Proper disclosures may even suggest that administrative expenses could be diminished by having the sale conducted in a case under Chapter 7 rather than in a Chapter 11 where significant processional fees will be incurred in addition to the quarterly U.S. Trustee fees.

      Even if the facts were different and this was an emergency involving quickly depreciating assets, the Debtor fails to meet the standards set forth in *Naron Wagner.*  The debtor in that case was a local accounting firm.  Its assets consisted of an accounting practice, office leases and equipment and a subsidiary business of distributing computer hardware and software. Judge Derby ultimately approved a sale of substantially all of the assets, but only after the debtor provided a detailed notice akin to adequate information that would be provided in a Disclosure Statement.  The other factor that justified a quick sale in *Naron Wagner* was that absent a sale, the debtor would have been forced to halt its business operations.  Neither of these *Naron Wagner* elements exists here.  In this case, Debtors have provided no financial information at all,

and the businesses are already closed. Accordingly, the Debtor cannot credibly claim that a quick auction sale is necessary to preserve value.

The last Emergency Motion being considered by the Court is an Emergency Motion authorizing interim and final use of Cash Collateral. Not surprisingly, the Cash Collateral Motion is tied to the Debtors' unsupported belief that a quick fire sale will maximize the value of its assets. Because the Debtors ceased all business operations at the end of March and laid off all employees except for its President and two others, the Debtors are seeking cash collateral authorization to bring back their laid off employees and have them provide services for the proposed auction sale. This is the classic putting the cart before the horse situation. The Debtors must establish a basis for an immediate fire sale and that using furloughed employees is more economical than using Ritchie Bros. employees before allowing the Debtors to use cash collateral.

It may ultimately be determined that a public auction sale is the best means to maximize value for creditors, but given the dearth of financial information as this juncture, all of the First-Day Motions should be denied at this time.

Dated: May 13, 2024
/s/ Alan M. Grochal
Alan M. Grochal, Bar No. 01447
Joseph M. Selba, Bar No. 29181
Michael J. Lentz, Bar No. 26097
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland 21202
Telephone (410) 752-9700
agrochal@tydings.com
jselba@tydings.com
mlentz@tydings.com

*Attorneys for L/B Water Service, Inc.*

6157094.2

6

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 13th day of May 2024, I verified that a copy of the foregoing **OMNIBUS OBJECTION TO FIRST-DAY MOTIONS** was served through CM/ECF to:

*Debtor's Counsel*

- Paul Sweeney        psweeney@yvslaw.com
- Jonathan A. Grasso  jgrasso@yvslaw.com

*United States Trustee*

- Lisa Yonka Stevens  lisa.y.stevens@usdoj.gov

*Notice Parties*

- William L. Hallam    WHallam@rosenbergmartin.com,
- Jeffrey M. Orenstein  jorenstein@wolawgroup.com
- Brent C. Strickland   bstrickland@wtplaw.com
- Roger Schlossberg     rschlossberg@schlosslaw.com


    /s/ Alan M. Grochal
Alan M. Grochal

6157094.2